# NO. 12-13-00334-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 173RD* |
| *K.L., B.L. & B.L.,* | § | *JUDICIAL DISTRICT COURT* |
| *CHILDREN,* | § | *HENDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

M.L. and B.R. appeal the termination of their parental rights. In five issues, M.L. and B.R. challenge the order of termination. We affirm.

### BACKGROUND

M.L. and B.R. are the father and mother of three children: B.L.1, born September 7, 2006; B.L.2, born March 28, 2008; and K.L., born June 4, 2010. On October 24, 2012, the Department of Family and Protective Services filed an original petition for protection of B.L.1, B.L.2, and K.L., for conservatorship, and for termination of M.L.'s and B.R.'s parental rights. The Department was appointed temporary managing conservator of the children, and M.L. and B.R. were appointed temporary possessory conservators.

At the conclusion of the trial on the merits, the trial court found by clear and convincing evidence that M.L. and B.R. had each engaged in one or more of the acts or omissions necessary to support termination of their parental rights, and that termination of the parent-child relationships was in the children's best interest.

Based on these findings, the trial court ordered that the parent-child relationships between the two parents and each of the three children be terminated. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights implicates fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2013); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM. CODE ANN. § 161.001(1) (West Supp. 2013); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (West Supp. 2013); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008).

## STANDARD OF REVIEW

"In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so, and we must disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 18-19 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *See id*. at 27-29. Further, "[a] court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d at 266. "[T]he trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given to their testimony." *In re S.J.G.*, 124 S.W.3d 237, 246 (Tex. App.–Fort Worth 2003, pet. denied).

The trial court's findings of fact and conclusions of law have the same force and dignity as a jury's verdict upon jury questions. *See Latch v. Gratty, Inc.*, 107 S.W.3d 543, 545 (Tex. 2003) (per curiam) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)). We review the trial court's findings of fact for legal and factual sufficiency of the evidence under the same standards as applied to jury findings. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). The trial court's conclusions of law are not reviewable from an evidentiary standpoint; however, we may review the conclusions drawn from the facts to determine their correctness. *See In re Marriage of Harrison*, 310 S.W.3d 209, 212 (Tex. App.—Amarillo 2010, pet. denied) (citing *Ashcraft v. Lookadoo*, 952 S.W.2d 907, 910 (Tex. App.—Dallas 1997, writ denied) (en banc)).

## TERMINATION UNDER SECTION 161.001(1)(E)

As part of their first and third issues, M.L. and B.R. argue that the evidence is legally and factually insufficient to support findings that they engaged in conduct, or knowingly placed the children with persons who engaged in conduct, that endangered their physical or emotional well-being.

**Applicable Law**

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(1)(E) (West Supp. 2013). "[T]he specific danger to the child's well-being need not be established as an independent proposition, but may instead be

3

inferred from parental misconduct." *In re J.J.*, 911 S.W.2d at 440 (citing *Tex. Dep't of Human Svcs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Scienter is not required for an appellant's own acts under Section 161.001(1)(E), but it is required when a parent places the child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Finally, children's need for permanence is of paramount importance when considering their present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d 190, 200 (Tex. App.—Amarillo 1999, no pet.).

"Endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). "[I]t is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Boyd*, 727 S.W.2d at 533. Subsection (E) requires us to look at the parent's conduct, including both acts and omissions. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. It is inconsequential whether the conduct occurred before or after the child's birth. *In re U.P.*, 105 S.W.3d at 229; *In re D.M.*, 58 S.W.3d at 812. Instead, courts look to what the parent did both before and after the child's birth to determine whether termination is necessary. *In re D.M.*, 58 S.W.3d at 812. A single act or omission is not enough for termination under subsection (E). *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious course of endangering conduct is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

A course of conduct that subjects a child to a life of instability endangers the child's emotional and physical well-being. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). A fact finder may reasonably infer from a parent's repeated refusals to drug test that the parent was using drugs. *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.). Illegal drug use by a parent after the parent has agreed not to use drugs as part of a service plan for reunification with the children is sufficient to prove voluntary, deliberate, and conscious endangerment by clear and convincing evidence. *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.).

4

**Analysis**

The Department first became involved with M.L. and B.R.'s family when the youngest child, K.L., was born in June 2010. At that time, the children were placed with a paternal great-uncle and great-aunt, L.L. and C.L., after all three children and both parents tested positive for methamphetamine. L.L. testified that the children suffered withdrawal symptoms from the exposure, including drooling, crying, and difficulty in speaking. The parents successfully completed services in that case, and the children were returned to their care after eighteen months with L.L. and C.L.

The Department became involved in the instant case in October 2012 under similar circumstances. The parents and all three children again tested positive for methamphetamine. The children were again placed with L.L. and C.L. L.L. testified that the children again suffered withdrawal symptoms. With the help of M.L. and B.R., a Family Plan of Service was created. Under this plan, M.L. and B.R. were required to attend all important meetings and appointments, maintain contact with the caseworker, submit to random drug testing, follow all recommendations as to drug rehabilitation and recovery to the provider's satisfaction, demonstrate an ability to live a drug-free and alcohol-free lifestyle, attend and participate in scheduled visitations with the children, provide healthy snacks and any necessary change of clothes or diapers for the visits, complete a parenting course, and participate in individual counseling.

M.L. and B.R. were evaluated by a substance abuse counselor, Stephanie Teel, who in December 2012 recommended long-term inpatient treatment for both. M.L. and B.R. testified that they waited until the Department changed its goal from reunification of the family to adoption of the children before they decided to participate in inpatient treatment. M.L. and B.R. each entered a thirty-day treatment program in July 2013.

Teel testified that M.L. and B.R. were not in recovery at the time of trial. She stated that a thirty-day treatment program was not enough for M.L. or B.R. M.L. and B.R. reported methamphetamine use to Teel throughout the case until the day before they entered treatment. Each parent failed a drug test in February 2013 and later refused drug tests in February, March, April, and June 2013. Upon discharge from treatment, M.L. and B.R. were instructed to attend ninety recovery meetings in the next ninety days, obtain a sponsor, work a twelve-step recovery program, and attend counseling. M.L. testified that, at the time of trial, he was attending three or

four recovery meetings per week. B.R. stated that she was attending four. Teel testified that there was an extremely high probability of relapse for both parents.

## Conclusion

Viewing the evidence in the light most favorable to the finding, we conclude that the trial court reasonably could have found that M.L. and B.R.'s methamphetamine use was voluntary, deliberate, and conscious; that it subjected the children to a life of uncertainty and instability; and that it endangered the children's physical and emotional well-being. *See In re M.E.-M.N.*, 342 S.W.3d 254, 263-64 (Tex. App.—Fort Worth 2011, pet. denied).

Some of the evidence supporting the trial court's finding is disputed. First, in explaining the speech problems that the children were having when they were removed, M.L. testified that there are hearing problems on both sides of his family that may have been passed down. M.L. also admitted, however, that he had used drugs and that his drug use had a harmful effect and caused the situation that the family was in. Additionally, in explaining why she waited so long to enter drug treatment, B.R. testified that she was unable to find a long-term treatment program. But M.L. testified that before the Department's goal change, M.L. and B.R. were not "vigorously" searching for a treatment program. Despite the disputed evidence, a reasonable trier of fact could have formed a firm belief or conviction that the children in this case were physically and emotionally endangered by M.L.'s and B.R.'s course of conduct. Therefore, we hold that the evidence is legally and factually sufficient to support termination of M.L.'s and B.R.'s parental rights under Section 161.001(1)(E). Accordingly, we overrule that portion of M.L.'s and B.R.'s first and third issues regarding Section 161.001(1)(E).[1]

## BEST INTEREST OF THE CHILDREN

As part of their first and fifth issues, M.L. and B.R. argue that the evidence is legally and factually insufficient to support a finding that termination of their parental rights was in the best interest of the children. In determining the best interest of the child, a number of factors are considered, including "(A) the desires of the child; (B) the emotional and physical needs of the

---

[1] Under Section 161.001, the Department was required to prove only one ground of termination under subsection (1). Because we have concluded that the evidence is legally and factually sufficient to support termination of M.L. and B.R.'s parental rights under subsection (1)(E), we need not determine whether the trial court's findings under subsections (1)(D) and (1)(O) are also supported by legally and factually sufficient evidence. Therefore, we do not address M.L. and B.R's first, second, and fourth issues regarding subsections (1)(D) and (1)(O).

6

child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent." *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

This list is not exhaustive, but simply indicates considerations that have been or could be pertinent. *Id*. The best interest of the child, however, does not require proof of any particular set factors. *In re D.M.*, 58 S.W.3d at 814. The *Holley* factors focus on the best interest of the child, not the parent's best interest. *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). We apply the *Holley* factors below.

## Analysis

M.L. and B.R. have long histories of drug abuse. The Department first became involved with the family when M.L. and B.R.'s third child, K.L., tested positive for methamphetamine at birth. In that case, the children were in foster care for eighteen months because of their parents' drug abuse. Within months of that case's dismissal, M.L. and B.R. were using methamphetamine again and the children were again placed in foster care. In both cases, the parents and all three children tested positive for methamphetamine.

For several months into the new case, M.L. and B.R. continued to report to Teel that they were using methamphetamine. They refused four drug tests during that time and failed one. In December 2012, Teel recommended long-term inpatient drug treatment for them, and they went in July 2013 after the Department changed its goal from reunification to adoption. Then, instead of completing long-term treatment, they completed only thirty days. According to Teel, a thirty day treatment program was insufficient. Once out of treatment, they failed to attend the prescribed ninety recovery meetings in ninety days. Teel testified that their odds of relapsing were extremely high.

During the pendency of the cases, the children were placed with L.L. and C.L. In the time between the two cases, the children often stayed with L.L. and C.L. while they were sick or so that M.L. and B.R. could "party." The cases were pending for a total of about three years— K.L.'s entire lifetime. The children are bonded with L.L. and C.L. and call them mommy and

daddy. L.L. testified that he loves them and thinks of them as his own children. L.L. and C.L. want to adopt the children.

L.L. and C.L. provide a very structured environment for the children. They get the oldest child to school every day and help him with homework. He participated in peewee football, and L.L. coached his team. The middle child is involved in cheerleading, and C.L. helps with that. The children are disciplined by the use of time out.

L.L. and C.L. have stable jobs. They are able to care for the children, and they understand their needs. They are a verified foster home for these children exclusively, and they receive assistance from the Department through various programs.

The caseworker, Julia Booth, testified that M.L. and B.R. do not have a bond with the youngest child, K.L., and that they admitted as much at a hearing earlier in the month. L.L. testified that he would allow the children to maintain a relationship with M.L. and B.R.

M.L. and B.R. missed some visits with the children in the beginning of the case, but their visits became more consistent after their inpatient treatment. Booth testified that B.L.1 sometimes acted out during visits to get attention. She stated that he seemed uncomfortable during the visits, and that he was much calmer and more relaxed in the home with L.L. and C.L. In the beginning, Booth could not identify any parenting skills M.L. and B.R. used in the visits. She stated that during the last two visits, M.L. and B.R. paid more attention to the children. M.L. testified that in the last visit, he used skills that he learned in a parenting class, including disciplinary skills. B.R. testified that she used parenting skills during that visit as well and was prepared to do so in the future.

**Conclusion**

Viewing the evidence in the light most favorable to the finding, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of M.L.'s and B.R.'s parental rights was in the best interest of the children. However, L.L., Booth, and the CASA volunteer in this case testified that there is a bond between M.L. and B.R. and the two older children. Moreover, M.L. and B.R. testified that they are now committed to remaining drug-free. They stated that they have learned to distance themselves from friends and family members who use drugs. M.L. and B.R. further testified that they have attended parenting classes and now know how to be parents and not just friends to their children. Additionally, Teel testified that M.L. and B.R. had gained weight and appeared healthier since leaving drug

8

treatment. However, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Although there is some evidence that conflicts with the trial court's finding, this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that terminating M.L.'s and B.R.'s parental rights was in the best interest of the children.

Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of M.L.'s and B.R.'s parental rights is in the best interest of the children. Accordingly, we overrule that portion of M.L.'s and B.R.'s first and fifth issues regarding the best interest of the children.

## DISPOSITION

We have overruled the portions of M.L.'s and B.R.'s first and third issues that pertain to termination under Texas Family Code 161.001(1)(E). We have also overruled the portions of M.L.'s and B.R.'s first and fifth issues pertaining to the best interest of the children. Because these issues are dispositive, we *affirm* the judgment of the trial court.

JAMES T. WORTHEN
Chief Justice

Opinion delivered February 19, 2014.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

9



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**FEBRUARY 19, 2014**

**NO. 12-13-00334-CV**

**IN THE INTEREST OF K.L., B.L. & B.L., CHILDREN,**

Appeal from the 173rd District Court

of Henderson County, Texas (Tr.Ct.No. 2010A-0791)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*